**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| DMP, a 14 year old minor suing by a name for privacy reasons, | ) ) ) |  |
| Plaintiff, | ) ) | **CIVIL ACTION** |
| v. | ) ) ) | **NO. 11-40073-TSH** |
| THE FAY SCHOOL, by and through its Board of Trustees, | ) ) ) |  |
| Defendant, | ) ) |  |

**MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 20)**

**March 18, 2013**

**HILLMAN, D.J.**

**Background**

DMP has filed a Complaint against The Fay School, by and through its Board of Trustees ("Fay") alleging claims for violation of Title III the American with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA") (Count I); and breach of contract (Count II). DMP seeks monetary and injunctive relief. This Memorandum of Decision And Order addresses Defendant's Motion for Summary Judgment (Docket No. 20)("*Fay's Sum.J.Mot.*").

**Facts**

Fay is a private co-educational school located in Southborough, Massachusetts, which has approximately 450 students in pre-kindergarten through ninth grade. Students in grades six through nine can board at the school. Fay's boarding students come from throughout the United States and the world.

Fay's educational philosophy is based on the following five core values which are the foundation for all activity at the school: Academic Excellence, Earnest Effort, Honorable Conduct, Dedicated Service, and Wellness of Mind, Body, and Spirit (collectively, "Core Values"). The core values are made known to faculty, students, staff and parents; all students are expected to adhere to the Core Values in all actions at the school. The essential nature of the school's Core Values are reflected in the 2010-2011 Parent and Student Handbook. *See sealed Exhibits* to *Fay's Sum.J.Mot.* (Docket No. 24-11) ("Handbook"). A copy of the Handbook was sent to all school families and all parents and students were required to acknowledge receiving it. DMP and his family received a copy of the Handbook prior to DMP attending Fay.

The Core Values are listed in the Handbook followed by this statement:

> These core values, and the guiding principles that support them, are the foundation of all aspects of life at Fay. They are reflected in the curriculum, in the policies that define the framework of student life, and in the expected behavior of all members of the Fay community. Each is considered of equal importance to the development of the whole child. Together, these core values provide the basis for the school's rating system.

*Handbook*, at p. 4.

Beginning in grade 3, in addition to academic grades, all students are given effort grades (on a scale of 1-9) every two weeks. The effort grades reflect, among other things, a student's disciplinary violations.

The Handbook also lists "major school rules"; students who violate a major school rule are subject to discipline, including probation, suspension, and dismissal. The first major school rule is "intellectual integrity" — cheating is considered a very serious offense. Additionally, Fay students are required to adhere to "a high standard of conduct, based upon concern and respect for all members of the Fay Community," — including being "kind, courteous, respectful, honest, and friendly" — and to "respect rights of other and to behave appropriately at all times."

Fay has two levels of probation for students who have been found to have violated school rules: social probation and final probation. Final probation is the more serious of the two; it is the last step before expulsion. A period of final probation usually ends with the end of the academic year. Students who have serious and/or repeated violations of the school rules are subject to discipline up to and including expulsion. Fay's Head of School makes the final decisions regarding student discipline. For the 2010-2011 academic year, Robert Gustavson was Fay's Head of School. A student can be expelled regardless of whether such student was on final probation at the time.

Over the past few years, several students have either withdrawn from Fay or been expelled for committing major rules violations. To the knowledge of the Head of School, every Fay student who has been on final probation who committed an act of academic dishonesty has either been expelled or withdrawn from the school in lieu of expulsion.

DMP's first year at Fay was the 2009-2010 academic year; he was in eighth grade and was a boarding student. That first year, Fay strongly suggested to DMP's parents that he be professionally evaluated to determine if he had a learning disability. DMP was evaluated and was diagnosed as suffering from Attention Deficit Hyperactivity Disorder ("ADHD"). Fay advised DMP's parents that on advice of its physician, it would not administer the medication

Amantadine to DMP because it was not approved by the Federal Drug Administration for treatment of ADHD. Consequently, Fay agreed to let DMP become a day student for the 2010 spring term so he could live with his father nearby and his father could administer his Amantadine.

During the 2009-2010 academic year, DMP had frequent disciplinary problems, including being late for classes, dormitory room violations, disrupting classes and failing to fulfill school obligations. In total, for his first year at the Fay School, DMP had approximately 60 disciplinary violations. Consequently, he was first placed on social probation and then final probation. The school day violations, *i.e.,* violations which occurred during school hours, broke down as follows[1]: twelve in the fall term (while DMP was a boarding student); twelve in the winter term (while he was a boarding student) and nine in the spring term (while he was a day student). DMP was on medication in the Spring Term; he was also on final probation during that period.

During the 2010 summer break, Fay changed its school physician; the new school physician approved the dispensing of Amantadine by the school's nurses. For that reason, DMP enrolled as a boarding student for the 2010-2011 academic year. Within a few days of returning to school in September 2010, DMP began to accumulate disciplinary violations. Fay officials met with DMP to discuss the need to improve and had him serve detentions in order to encourage him to improve his behavior. By early November 2010, DMP had so many disciplinary violations that the DC formally met with him and his advisor to review his conduct. He was placed on final probation for the remainder of the 2010-2011 academic year. On or about November 4, 2010, Matt Evans, the head of Fay's Upper School ("Evans") notified DMP's

---

[1] Some violations, such as being late for evening study or failing to clean a dorm room, occur outside the regular school day and can only be committed by boarding students.

parents that he had been placed on final probation. DMP also understood that he had been placed on final probation. Nonetheless, DMP continued to incur frequent disciplinary violations. By March 2011, he had 62 disciplinary violations and nine detentions. The violations included skipping classes, not being where he was supposed to be, destroying property that did not belong to him (a pumpkin), disrupting classes, chewing gum in chapel, and taking gummy bear vitamin pills that had been prescribed for another student from the nurses' medication tray after being told not to do so.

In late January or early February 2010, DMP wrote Evans a letter thanking him for the chances and opportunities Evans had given him; he apologized for letting Evans down each time and stated that he had probably been the "highest maintenance" student at Fay during the past year and a half. He stated that he had gotten so used to breaking rules that he was going to have a hard time changing his attitude at Fay. He then stated that "[e]xpulsion" is on the table. This was written during a period when DMP was getting written up while on final probation. No meeting of the DC was scheduled during this period; Evans, who set the agenda for the DC, was gathering input from Fay faculty on whether further disciplinary action might be warranted.

On February 28, 2011, DMP cheated on a quiz in biology class during which students were allowed to access their notes on their computers to answer questions. DMP looked at another student's computer and DMP's quiz answers were almost identical to the other students. When confronted, DMP admitted to cheating. A couple of days later, DMP skipped a meeting with his advisor and lied to his advisor about where he had been. Both the cheating and the lying to his advisor are major rules violations under the Handbook and at the time, DMP was on final probation.

During the school year, DMP frequently did not appear at the nursing office to receive his medications as scheduled; for a student on medication, failure to go to the nurses' station to receive the medication is a violation of school rules. Instead, as an accommodation, school nurses brought DMP's medication to him, including summoning him from class or other school locations. Fay's medication logs show that from February 4, through and including February 28, 2011, DMP skipped his twice daily Amantadine medication four times, while he took the medication thirty-eight times; he was in his parent's custody and control for the remaining eight doses.

As of spring of 2011, Fay had nine students, excluding DMP, diagnosed with ADHD, including one who was a boarding student. Two of these students, one a boarding student and one a day student, received medication daily while at the Fay school to treat their ADHD; the boarding student received medication twice a day and the day student once a day. Both of these students came to the nursing office for their medication on a consistent and timely basis.

From February 17-21, 2011, DMP visited his family in California. On the morning of February 22, 2011, DMP went to the school health center and slept for three hours; he claimed to be exhausted.

According to Dr. William Singer (DMP's treating physician for his ADHD), cheating on a test or lying are not side effects of the medicine which DMP was taking. DMP's ADHD might make him more impulsive.[2]

---

[2] In his deposition testimony, Dr. Singer, Plaintiff's expert, unequivocally testified that it is not a side effect of Amantadine for someone taking it to cheat on a test. He further testified that children with ADHD are more impulsive and it is more likely that children suffering from ADHD might do something like cheat on a test—it is not the medicine that would cause them to cheat. *See Materials in Sup. Of Mot. For Sum. J.* (Docket No. 24), *Att.8* (*Dep. Of William D. Singer, M.D*), at. p. 19. Dr. Singer also testified that he could not say that if DMP had consistently and appropriately taken all doses of his medicine he would not have cheated on his test. *Id.*, at 34. As part of his opposition to the motion for summary judgment, DMP has included a further statement by Dr. Singer, in which Dr. Singer purports to supplement his response concerning whether his medication and/or failure to take his

On March 4, 2011, Fay's head of school expelled DMP since he had admitted to two major rules violations while on final probation: cheating and lying to his advisor. Such a decision by the Head of School is final, although the student is usually given the option of withdrawing in lieu of expulsion. The Head of School made his decision without receiving a recommendation from the DC, which did not hold a meeting.

DMP's father was visiting the school on March 4th and was informed of the expulsion decision. DMP's father requested that the school not inform DMP of his expulsion until after he had completed his final term exam on March 10, 2011. On March 9, 2011, DMP's parents asked that he be permitted to withdraw from school for medical reasons rather than being expelled. Fay's head of school agreed. DMP's parents also requested that he be permitted to return to Fay for the Spring term, but as a day student. Fay's Head of School denied the request that DMP be allowed to return as a day student. On March 26, 2011, his father formally withdrew him for medical reasons. The school accepted his withdrawal the following day.

While attending the ninth grade at Fay, DMP was also applying to high schools in the Northeast and California. Even before he was expelled by Fay, his parents intended that DMP, who was had been the youngest in his class at Fay, repeat ninth grade at his new high school. None of the schools which DMP applied to withdrew its acceptance or denied acceptance to

---

medication could have led to the cheating episode. *See Declaration of Dr. William Singer* (Docket No. 37-1), attached to *Pl's DMP's Mem. In Opp. To Def. The Fay School's Mot. For Sum. J.* (Docket No. 37). It is black letter law that while a party can create a genuine issue of material fact by submitting affidavit testimony which supplements deposition testimony, a party *cannot* create a genuine issue of material fact by submitting affidavit testimony which contradicts what a witness said during his/her deposition. *Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 26 (1st Cir.2002)(absent a satisfactory explanation, party opposing summary judgment cannot create genuine issue of material fact by filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition.). Since I find that Dr. Singer's declaration contradicts his deposition testimony without adequate explanation, I will not consider it for purposes of this motion.

7

DMP as the result of his having withdrawn from Fay. DMP accepted an offer to attend the Woodside Priory School in California beginning in August 2011.[3]

Additional facts necessary to the Court's decision will be included as in the relevant discussion.

## Discussion

### Summary Judgment Standard Of Review

When ruling on a motion for summary judgment, the Court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986)).

### Plaintiff's Claim Under The ADA

DMP has sued Fay under Title III of the ADA alleging that Fay failed to reasonably accommodate his disability, *i.e.*, his ADHD, by refusing his parents' request to allow him to spend his last trimester of the academic year as a day student. Plaintiff asserts that he seeks monetary damages and injunctive relief. Fay argues that since DMP already began attending

---

[3] Apparently, things did not work out for DMP at the Woodside Priory School and he has transferred to one or more other schools since being admitted there.

ninth grade in another school in August 2011 and would not be able to return to Fay (Fay only goes through the ninth grade), his request for injunctive relief is moot and therefore, Fay is entitled to summary judgment on his ADA claim. In response, to the mootness argument, DMP argues that he continues to be harmed because his Fay transcript reflects that he withdrew from Fay for medical reasons; this notation could have a negative connotation which could cause him future harm if applies to attend college.

"[I]n federal court, justiciability requires the existence of an actual case or controversy. The 'case or controversy' requirement persists at all stages of the litigation and not merely at the time suit is instituted." *Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 48 (1st Cir. 2006)(internal citations omitted). Thus, if after suit events transpire which would make it impossible for the Court to provide effective relief with respect to any claim, that is, where the parties no longer have a "legally cognizable stake in the outcome," the claim is moot. *See Id.*

In his Complaint, the only injunctive relief sought be DMP is that he be allowed to return to Fay to complete the term as a day student; no mention is made of the notation on his transcript that he withdrew for medical reasons and no mention is made as to any possible stigma which might attach to any such notation. This is not surprising given that DMP's parents expressly bargained that he be allowed to withdraw for medical reasons to avoid the possible stigma which would attach should his transcript instead reflect that he was expelled for cheating and/or lying to his advisor. More to the point, DMP did not graduate from Fay and therefore, his transcript cannot reflect that he did. The only other alternatives are to have the transcript reflect, 1) that he was expelled; or 2) that he withdrew without providing any reason. DMP suggests that the latter would be preferable to "withdrawn for medical reasons." However, he has failed to establish that such modification is a viable or meaningful alternative to the status quo—which simply

serves to underscores the fact his ADA claim under Title III is moot. Even if DMP's ADA claim were not found to be moot, for the reasons set forth below, I would find that Fay is entitled to summary judgment on this claim.

Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...." *See* 42 U.S.C. §12182(a). Fay is a place of public accommodation to which Title III applies. *See Bercovitch v. Baldwin School,* 133 F.3d 141, 153 (1st Cir.1998). To prevail on his ADA Title III claim, DMP must show: (1) he is disabled within the meaning of the ADA; (2) he was otherwise qualified for participation in the Fay's program; (3) he made a request for a reasonable accommodation from Fay; and (4) Fay denied the request. *Axelrod v. Phillips Aced.* 46 F.Supp.2d 72, 83 (D.Mass. 1999) and cases cited therein. I assume for purposes of this discussion that DMP was disabled within the meaning of the ADA. However, because I find that he failed to request a reasonable accommodation and was not otherwise qualified to matriculate at Fay, he has failed to establish a claim for violation of the ADA.

Cheating and lying are behaviors which are unacceptable at an institution of learning, regardless of whether Plaintiff can attribute such behavior to his disability or not. It is undisputed that Fay places great emphasis on its core values, including "Honorable Conduct." Furthermore, it is undisputed that cheating is a major rules violation under the Handbook. In this case, DMP committed a major rules violation *while on final probation and after having amassed over one hundred and twenty disciplinary violations in less than two academic years.* Simply put, Fay is not required to compromise the integrity of the school's policies, values and/or academic

requirements in order to "accommodate" a student's disability. *Accord generally Axelrod*, 46 F.Supp.2d at 72.

Additionally, the "reasonable accommodations which DMP's parents requested were that he be permitted to attend Fay as a day student and that Fay take greater steps to ensure that he took his medication. However, during a prior term, DMP had continued to accrue disciplinary violations while on his medication and attending Fay as a day student-- albeit at a slightly lesser pace. Thus, the "reasonable accommodations" requested by DMP's parents had demonstrably failed to alleviate his disciplinary problems. Therefore, DMP was not qualified to attend Fay. *Cf. Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141 (1st Cir. 1998)(school's code of conduct is not superfluous to its proper operation. it is integral aspect of productive learning environment; student who cannot be "otherwise qualified" unless with reasonable accommodation he can meet disciplinary requirements). Under the circumstances, Fay is entitled to summary judgment on DMP's ADA claim, as a matter of law.[4]

### Plaintiff's Claim For Breach Of Contract

"[A]bsent a contractual commitment to the contrary, schools 'have wide discretion in school discipline matters.'" *Driscoll v. Bd. of Trustees of Milton Academy*, 70 Mass. App.Ct. 285, 292 (2007)(citation to quoted case omitted). "A private … school may not arbitrarily or capriciously dismiss a student. If school officials act in good faith and on reasonable grounds,

---

[4] Although not argued by the Defendants, the Court has serious doubts as to whether DMP can establish that for purposes of his Title III claim he requested any reasonable accommodations that were denied by Fay. Assuming that DMP's actions could be attributed to the school's inability to ensure that he regularly took his medication, DMP's parents were aware of the staff's deficiencies in this regard and were also aware that he was continuing to have disciplinary problems at school well before the cheating episode—indeed, before that episode, he had already amassed sufficient disciplinary violations to have been placed on final probation. Nonetheless, DMP's parents did not request that he go back to being a day student until *after* the decision to expel him had been made. The end result is that DMP's parents did not request an accommodation that would assist DMP in abiding by a punishment that had been imposed for a major rules violation, but instead, requested an accommodation *that would have vacated the punishment altogether*. The requested accommodation was neither reasonable nor timely and Fay was well within its rights to deny it.

however, their decision to suspend or expel a student will not be subject to successful challenge in the courts. Violations of reasonable rules and regulations of a school are a recognized ground for dismissal of a student." *Coveny v. President & Trustees of College of Holy Cross*, 388 Mass. 16, 19 (1983 (internal citations omitted). Therefore, in order to prevail, DMP must either establish that Fay breached a contractual right, or clearly abused its discretion in enforcing its policies and regulations.

As to the latter, private schools are given broad discretion to meet their educational and doctrinal responsibilities and unless the school clearly abuses its discretion in enforcing it policies and regulations, courts will not interfere in the manner in which the school carries out such policies and regulations. DMP has failed to adduce any evidence that Fay abused its discretion in expelling him. On the contrary, given that DMP had amassed over 120 disciplinary violations in a relative short period of time and that he admitted to cheating while on final probation, and then lying to an advisor (concerning his whereabouts when he missed a scheduled appointment), the Head of School's decision to expel DMP was neither arbitrary nor capricious— indeed, he acted well within the proper discretion when he expelled DMP. The question thus becomes whether Fay violated a contractual right by expelling DMP.

DMP alleges that the Handbook created a binding contract which Fay breached when the Head of School expelled him without holding a meeting of the DC at which he could appear with an advocate. Fay argues first, that the Handbook does not create a binding contract. If the Court finds that the Handbook creates a binding contract between Fay and DMP's parents (who signed on behalf of themselves and DMP), Fay argues that the Handbook gives the Head of School the discretion to refer serious misconduct, such as a major rules violation, to the DC to hold a hearing before imposing punishment— however, it does not mandate that he do so. Fay

further argues that the provision which provides for referrals of more serious misconduct to a DC does not apply when the offending student is already on final probation; in such a case, the determination of any punishment to be imposed rests solely with the Head of School.

### *Whether The Handbook Is A Binding Contract*

The Court need not spend much time on this issue of whether the Handbook is a binding contract between Fay and its students.  Massachusetts law has long recognized that in the context of private education, there is a contractual relationship between the school and student, the terms of which may include reciprocal rights and oblations set forth in the student handbook.  In this case, Fay requires each student and their parents to sign an acknowledgment that they have received the Handbook for the current academic year.  The policies, regulations and procedures contained in the Handbook are contractual in nature and binding on Fay and its students.

### *Whether Fay Breached The Contract By Expelling DMP*

When "interpreting contract claims based on school handbooks[,] … [the court] employ[s] 'the standard of "reasonable expectation— what meaning the party making the manifestation, the [school], should reasonably expect the other party to give it." ' " *Driscoll*, 70 Mass. App.Ct. at 293 (internal citations and citation to quoted case omitted).  The interpretation of the contract and whether the contract is ambiguous are questions of law for the court.

As to the former, I find that there exists an ambiguity in the provisions of the Handbook governing the procedures which Fay was required to follow in connection with expelling DMP. Specifically, the Handbook provisions governing the imposition of discipline provide as follows:

> Incidents of more serious misconduct *may* be referred to the Discipline Committee, which is composed of members of the Upper School faculty and administration.  This committee makes recommendations for further action to the Head of School.  The advisor, or an advocate of the student's choice is asked to attend and the student is given the opportunity to address the group. The final decision on the assignment of consequences rests with

13

> the Head of School. When a student's misconduct is referred to the Discipline Committee, parents are contacted and updated through the process.
>
> Recommendations by the Committee include, but are not limited to, campus and/or dorm restrictions (for boarders), loss of leadership positions, community service, mandatory health evaluations, suspension from school, or expulsion. Following disciplinary action, students are placed on Probation, a trial period during which the breaking of a Major School Rule would likely result in a prolonged suspension or expulsion. Probation may be Social or Final (a last step before expulsion).
>
> *Social Probation*— Students are placed on social probation as a result of disciplinary hearing or a the discretion of the Head of Upper School. A student on social probation has exhibited behavior indicating that he or she is in need of increased supervision and regular communication with the Head of Upper School. Consequences associated with social probation may include loss of privileges, daily check-ins with the Head of Upper School, and/or a conduct agreement.
>
> *Final Probation*— Students placed on final probation have exhibited behaviors that are inconsistent with Fay's Core Values. A student on final probation is at elevated risk for expulsion should his or her unacceptable behavior continue.

*Handbook*, at p. 34. The Handbook also provides that "Fay School reserves the right to alter, amend, or modify the policies and procedures in this handbook at any time." *Id.*, at p. 2. Finally, the Handbook provides that "[s]tudents who violate major school rules are subject to disciplinary consequences including probation, suspension and dismissal." *Id.*, at p. 31.

DMP's parents signed an enrollment contract for the 2010-2011 academic year which provided in relevant part as follows:

> I understand in signing this enrollment contract that I am agreeing on my own behalf and on behalf of the enrolled student to abide by the rules and regulations of Fay School as stated in School publications and as from time to time may be promulgated. I understand that Fay School may dismiss or suspend the above student for violation of School rules and regulations as determined by Fay School.

*See sealed Exhibits* to *Fay's Sum.J.Mot.* (Docket No. 24-10)("*Enrollment Contract*").

Fay asserts that in accordance with the above provisions, the Head of School has the right to unilaterally impose discipline on students who commit major rules violations, including expulsion, but that he may, at his discretion, first refer the matter to the DC. Fay further asserts that the provision requiring that students being placed on *probation* following disciplinary action before the DC bolsters its argument that the Head of School has the unilateral authority to *expel* a student. DMP, on the other hand, argues that when a student is charged with a major rules violation, the procedures outlined above require the holding of a hearing before the DC at which s/he can present his/her side with the assistance of an advisor or advocate; the DC then makes a recommendation to the Head of School, at which point the Head of School can make a final decision.

For purposes of this case, the question becomes, would a reasonable student in DMP's position, *i.e.,* a student who has admitted to two major rules violations while on final probation (cheating on a quiz and lying to an advisor), reasonably believe that the Head of School had the discretion to unilaterally expel him without first providing him the opportunity to appear before the DC with his advisor or an advocate of his choice? On the record before, me I cannot answer that question.

While at the end of the day, there can be no question that DMP's misconduct warranted his dismissal from Fay, there is a genuine issue of material fact as to whether Fay adhered to its own policies and procedures in reaching the decision to expel DMP. Therefore, Fay's motion for summary judgment on DMP's claim for breach of contract is denied.

## **Conclusion**

Defendant's Motion for Summary Judgment (Docket No. 20) is ***allowed*** in part and ***denied*** in part as provided in this Memorandum of Decision.

                                           ***/s/ Timothy S. Hillman***  
                                           TIMOTHY S. HILLMAN  
                                           DISTRICT JUDGE